IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:19-cv-40

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**, <br><br> Plaintiff, <br><br> v. <br><br> **DAVID BERNHARDT**, Secretary of the Interior; and **MARGARET EVERSON**, Principal Deputy Director of U.S. Fish and Wildlife Service; <br><br> Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. The Center for Biological Diversity ("the Center") brings this case against David Bernhardt, Secretary of the Interior, and Margaret Everson, Principal Deputy Director of the U.S. Fish and Wildlife Service (collectively the "Service"), for violating sections 4(f), 7(a)(1), and 2(c)(1) of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544; as well as the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706. Specifically, the Service has failed to update its outdated red wolf recovery plan after committing to do so by the end of last year.

2. Although red wolves once roamed most of the southeastern United States, only 14 red wolves are known to exist in the wild today. With just one remaining wild population in northeastern North Carolina, the species could be driven to extinction by threats such as shootings and hybridization with coyotes.

1

3. To help prevent the red wolf's extinction, the Center and its allies petitioned the Service to revise its red wolf recovery plan, which has not been updated since its drafting in 1990. An updated plan would prescribe all the measures needed for red wolf conservation, such as coyote sterilization to reduce hybridization, release of captive wolves to compensate for shooting deaths, and reintroductions to expand the species' range.

4. The Service responded to the Center's petition by stating that revising the red wolf recovery plan was a "high priority" and that updates were necessary to "incorporate new information about the status of the red wolf found in recent studies and findings." The Service stated that it expected to complete the new plan by the end of last year, but that process has stalled. It appears that the Service has not even formed the recovery team that will be tasked with developing the updated plan.

5. Through this litigation, the Center asks the Court for an order providing a deadline for the Service to update the red wolf recovery plan.

## JURISDICTION AND VENUE

6. This action arises under the ESA, 16 U.S.C. §§ 1531-1544, and the APA, 5 U.S.C. §§ 551, 701-706. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); *id.* §§ 2201-2202 (declaratory judgments and further relief); 16 U.S.C. §§ 1540(c), (g)(1)(C) (action arising under the ESA and citizen suit provision); and 5 U.S.C. § 702 (APA). Insofar as is legally required, the Center has given notice to the Service of its claims under the ESA. 16 U.S.C. § 1540(g)(2)(C).

7. Venue in this Court is proper under 28 U.S.C. § 1391(e) because the only remaining wild population of red wolves occurs in this District. Additionally, this District houses

the Service's Raleigh Ecological Services Field Office, where the Service often makes decisions about red wolves.

## PARTIES

8. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a nonprofit organization dedicated to the protection and restoration of biodiversity. The Center is based in Tucson, Arizona, with offices throughout the country, including in North Carolina, Florida, and Washington D.C. The Center has over 1.6 million members and supporters, including many who live within the red wolf's current and historical range.

9. Because the Center values the red wolf and its important ecological roles, the Center places high priority on protecting and recovering the red wolf across its historical range. The Center works toward this goal through education, advocacy, and litigation.

10. For example, on December 8, 2016, a coalition of wildlife protection groups – led by the Center and the Animal Welfare Institute – petitioned the Service to prepare a revised red wolf recovery plan.

11. Additionally, in May of 2016, the Center and its allies submitted an emergency petition to the Service to strengthen existing regulations for the red wolf. Specifically, the petition sought a revised 10(j) rule that would reduce shooting deaths, establish additional wild populations of red wolves, and reclassify all reintroduced populations of red wolves as "essential" experimental populations.

12. The Center's members – including its Board members, supporters, and staff – live, work, recreate, study, and otherwise use and enjoy areas throughout the red wolf's current and historical range in the lower 48 states. In such areas, the Center's members frequently engage in hiking, camping, boating, wildlife watching, photography, and other activities, and

will continue to do so. The Center's members enjoy seeing red wolves and signs of red wolves (like tracks and scat) in the wild and would like to see them in more of their historical range.

13. The Center's members have suffered, and will foreseeably continue to suffer, direct injuries to their recreational, aesthetic, scientific, professional, spiritual, and other interests and activities because of the Service's failure to update the red wolf recovery plan. These are actual, ongoing, concrete injuries, traceable to the Service's inaction, that would be redressed by the relief requested. Specifically, if the Court orders the Service to update the red wolf recovery plan by incorporating recent science and prescribing red wolf recovery in additional areas across its historical range, it will further the conservation of red wolves and protect the interests of the Center and its members in the species.

14. Defendant DAVID BERNHARDT is the Secretary of the Department of the Interior. The Secretary of the Interior is responsible for making decisions and promulgating regulations under the ESA, including decisions regarding recovery planning. He is sued in his official capacity.

15. Defendant MARGARET EVERSON is the Principal Deputy Director of the U.S. Fish and Wildlife Service. The Secretary of the Interior has delegated to the U.S. Fish and Wildlife Service, among other things, the authority for responding to petitions for rulemaking and the responsibility to develop and implement recovery plans for non-marine species. She is sued in her official capacity.

## BACKGROUND

### A. THE ESA: IMPORTANT ROLE OF RECOVERY PLANS

16. The Endangered Species Act is intended to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved"

and to "provide a program for the conservation of such species." 16 U.S.C. § 1531(b). The ESA defines "conservation" as the "use of *all* methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," *id*. § 1532(3) (emphasis added), i.e. to bring about the recovery of listed species.

17. To carry out the ESA's paramount purpose that listed species be "conserved," section 4(f) of the Act sets forth a detailed process for the development and implementation of recovery plans. Section 4(f)(1) provides that the Service "shall develop and implement [recovery] plans for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless [it] finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f)(1). The Service, "in developing and implementing recovery plans, shall, to the maximum extent practicable" incorporate "such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species," as well as "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list." *Id*. §§ 1533(f)(1)(B)(i), (ii).

18. Reinforcing the importance of recovery plans, Congress provides for public participation in the development and amendment of the plans. For example, prior to final approval of any "new or revised recovery plan," the Service must "provide public notice and an opportunity for public review and comment on such plan," 16 U.S.C. § 1533(f)(4), and the Service "shall consider all information presented during the public comment period prior to approval of the plan." *Id*. § 1533(f)(5). The Service must also "report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant

Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and the status of all species for which such plans have been developed." *Id*. § 1533(f)(3).

19. Section 7(a)(1) of the ESA provides an "affirmative duty" for federal agencies to conserve listed species and states that all federal agencies shall "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species . . . ." 16 U.S.C. § 1536(a)(1). Section 2(c)(1) of the Act likewise declares it to be the "policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." *Id.* § 1531(c)(1). This substantive mandate ensures that listed species benefit from implementation of actions needed for their survival and recovery.

20. The ESA's citizen suit provision provides for judicial review where the Service has failed to perform a mandatory duty under ESA section 4. 16 U.S.C. § 1540(g)(1)(C). The APA provides the standard of review, 5 U.S.C. § 706(2)(A), and provides for judicial review of the Service's violations of ESA sections 7(a)(1) and 2(c)(1) – the affirmative duty to conserve, *id.* § 702. Additionally, under the APA, a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). And section 552(b) of the APA provides, in pertinent part, that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." *Id*. § 555(b).

B.  THE RED WOLF AND ITS OUTDATED RECOVERY PLAN

21. Once common throughout the southeastern United States, most of the red wolf's populations were extirpated by the mid-1900s due to eradication programs, hybridization with

coyotes, and habitat degradation. Animals from a remnant red wolf population in Louisiana and Texas were removed from the wild in 1975 for a captive-breeding program, and the wolf was declared extinct in the wild in 1980.

22. In 1982, the Service designated an experimental population for the species under section 10(j) of the Act. The captive breeding program supplied a reintroduction effort in 1987 to the Alligator River National Wildlife Refuge in North Carolina. The red wolf recovery area was later expanded to include three national wildlife refuges, a Department of Defense bombing range, state-owned lands, and private property, altogether spanning a total of 1.7 million acres.

23. The Service developed a red wolf recovery plan in 1990 based on its knowledge of red wolves and its management goals at the time. That plan calls for the establishment of 220 red wolves in three wild populations.

24. For its first 25 years, red wolf reintroduction was a considerable success, growing the wild population to over 120 wolves by 2001 and peaking in 2006 with 130 wolves in 20 packs throughout the recovery area.

25. That growth of the wild red wolf population stemmed from implementation of several successful red wolf conservation strategies, including the "Red Wolf Adaptive Management Plan" to address the threat of hybridization with coyotes.

26. The Adaptive Management Plan prescribed radio-collaring of red wolves, removal of coyotes or hybrids, sterilization of coyotes to serve as placeholders (that would maintain territories against further encroachment of coyotes without genetic risk to red wolves), release of additional red wolves from captivity, and fostering of captive-born pups in wild litters to increase genetic diversity and overall abundance.

27. Several peer-reviewed studies found that the implementation of the Adaptive Management Plan was successful at both increasing the population and limiting introgression with coyotes.

28. For the last decade, however, the red wolf population in eastern North Carolina has been drastically declining. Red wolf numbers began plummeting in the mid-2000's when the state of North Carolina loosened regulations on coyote hunting that in turn increased accidental killings of red wolves. Indeed, following relaxation of the rules on coyote hunting, scientists documented a roughly 375 percent increase in red wolf shooting deaths, and shootings caused an estimated 30 out of 65 red wolf deaths from 2012 to 2015. This increased mortality in turn led to increased hybridization with coyotes.

29. Rather than working to curb these shooting deaths, the Service began in 2015 to dismantle its red wolf recovery program.

30. In early 2015, the Service stopped sterilizing coyotes, despite evidence indicating that use of coyotes as placeholders reduces production of hybrid litters and thereby limits genetic introgression. The Service also began removing red wolves from private lands at landowners' requests and issuing permits authorizing landowners to shoot red wolves.

31. The Service also curtailed investigations of suspected illegal red wolf killings. In fact, the Service did not issue any timely law enforcement press releases seeking information on illegal shootings of red wolves between 2014 and April 2016.

32. Thereafter, the Service announced that it would no longer release captive red wolves into the wild, despite severe declines in the wild population.

33. The Service commissioned the Wildlife Management Institute (WMI) to conduct an independent review of the Red Wolf Recovery Program. The WMI evaluation supported

recovery of a wild population in North Carolina, concluding that the "experimental release of captive red wolves to the wild in 1987 proved red wolves could survive and successfully reproduce in the wild." The WMI evaluation also concluded that although the red wolf reintroduction program was successful, further recovery would depend on the establishment of at least two additional populations and the allocation of additional resources from the Service to build local stakeholder support for the program.

34. Thereafter, in 2018, the Service proposed a new 10(j) rule that would shrink the recovery area where red wolves can safely roam by more than 90 percent. The proposed change would eliminate protections for any red wolves that disperse out of Alligator River National Wildlife Refuge and the nearby Dare County Bombing Range, and it would allow anyone to kill red wolves outside of that narrow recovery area. Under its proposal, the Service would require no justification for this killing.

35. The red wolf is now one of the world's most endangered mammals. The species is classified as "critically endangered" by the International Union for Conservation of Nature (IUCN). In its proposed 10(j) rule, the Service reports 24 known red wolves in five counties with an estimated total population in the wild of approximately 30 to 35 individuals. Since then, the wild red wolf population has dropped down to just 14 known individuals.

C.  THE CENTER'S PETITION TO UPDATE THE RED WOLF RECOVERY PLAN

36. On December 8, 2016, a coalition of seven wildlife protection groups, including the Center, petitioned the Service to prepare an updated red wolf recovery plan.

37. The petition summarizes recent science on red wolf management and explains that a variety of recovery actions are needed to address the numerous threats to the wild red wolf population. The petition asks that the Service prescribe these recovery actions in an updated

9

recovery plan, although completion of a new plan is not a prerequisite to the Service taking these urgently required recovery actions. Specifically, to address gunshot mortality, the Service should promulgate a revised 10(j) rule that reduces the number of wolves that can be legally shot or removed. The Service should also work with the state government to restrict coyote hunting in the wolf's range and should educate landowners and hunters on how to prevent red wolf deaths caused by mistaken identity and poaching.

38. Reducing red wolf shootings to allow for growth of the wolf population would also help address the threat of hybridization with coyotes. Until that time, use of sterilized coyotes as placeholders is a proven tactic for addressing this threat. Genetic diversity can be maintained through fostering of captive-born pups by wild packs and by releasing other captive-raised wolves into the wild. Disease monitoring and prevention plans are needed to address the threat of disease.

39. The petition also explains that reintroduction of red wolves to additional sites within their historic range is of critical importance to red wolf recovery. Additional individuals would not only grow the population and expand its range, but they would also help reduce the risks associated with small and isolated populations, such as inbreeding depression and disease.

40. The success of reintroduced populations depends in large part on maintaining positive public attitudes towards red wolves. Financial incentives for impacted landowners and public education campaigns are necessary components of a revised red wolf recovery plan.

41. The Service responded to the Center's petition on January 19, 2017. The Service stated that "[d]eveloping a revised recovery plan for this species is a high priority and will commence shortly after completion of the SSA [Species Status Assessment] with the goal of completing the Revised Recovery Plan in 2018." The Service explained that a revised recovery

plan would "incorporate new information about the status of the red wolf found in recent studies and findings." It further stated that "the recovery plan will be developed using the best available science, including the SSA along with the information you submitted with your petition."

42. The Service completed the Species Status Assessment in April 2018 but has not revised its outdated recovery plan, despite recognizing the need to do so and planning to complete the update last year. In fact, upon information and belief, the Service has not yet assembled a recovery team to develop the updated plan.

## FIRST CLAIM FOR RELIEF

**ESA Section 4(f): Failure to "develop and implement" a plan that provides for the "conservation and survival" of the species**

43. The Center hereby realleges and incorporates all preceding paragraphs.

44. Under section 4(f) of the ESA, the Service has a non-discretionary duty to "develop and implement" recovery plans for the "conservation and survival" of listed species. 16 U.S.C. § 1533(f)(1). The ESA broadly defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3).

45. To provide for "conservation" of the red wolf, the Service must update the outdated red wolf recovery plan and prescribe "use of all methods and procedures which are necessary" to bring the red wolf "to the point at which the measures provided [by the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

46. Indeed, the Service explained in its response to the Center's 2016 petition that an updated red wolf recovery plan is a "high priority" and that it planned to complete the revision in 2018.

47. Furthermore, the Service explained in its response to the Center's 2016 petition that a revised recovery plan was needed to "incorporate new information about the status of the red wolf found in recent studies and findings." The Service also stated that it would develop an updated plan "using the best available science," including information from the Center's 2016 petition and the Species Status Assessment.

48. Yet the Service has not updated the red wolf recovery plan since its drafting in 1990.

49. As the Center's petition explains, conservation of the red wolf requires development of an updated red wolf recovery plan that includes these key actions: (1) revising the regulatory framework to reduce removals of red wolves from the wild; (2) resuming coyote sterilization to diminish hybridization; (3) resuming the pup fostering program to increase the wild population's genetic diversity; (4) utilizing additional reintroduction sites to increase the size of the wild red wolf population and expand its range; and (5) using outreach and education to garner additional support for red wolves and reduce illegal killings.

50. Because the Service has not completed its promised revision of the outdated 1990 Recovery Plan, as the ESA requires, the Service has failed to "develop and implement" a legally valid plan for the "conservation and survival" of the red wolf, in violation of ESA section 4(f), 16 U.S.C. § 1533(f)(1).

## SECOND CLAIM FOR RELIEF

**ESA Sections 7(a)(1) and 2(c)(1): Violation of the affirmative duty to conserve the red wolf in failing to update the outdated red wolf recovery plan**

51. The Center hereby realleges and incorporates all preceding paragraphs.

52. Section 7(a)(1) of the ESA provides an "affirmative duty" for federal agencies to conserve listed species. Under section 7(a)(1), all federal agencies have a non-discretionary duty

to "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species . . . ." 16 U.S.C. § 1536(a)(1). Section 2(c)(1) of the Act likewise declares it to be the "policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." *Id.* § 1531(c)(1). The ESA broadly defines "conservation" to mean "the use of *all methods and procedures* which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3) (emphasis added).

53. Revision of the outdated red wolf recovery plan is a "procedure[] . . . necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3).

54. The Service has not updated the red wolf recovery plan, even though it committed to do so last year in its response to the Center's petition.

55. "Conservation" of the red wolf cannot be achieved if the Service continues to rely on an outdated plan from 1990, especially given that the Service agreed, in its response to the Center's 2016 petition, that a revised recovery plan was needed to "incorporate new information about the status of the red wolf found in recent studies and findings" And the Service committed to develop an updated plan "using the best available science," including information from the Center's 2016 petition and the Species Status Assessment.

56. Furthermore, because the red wolf once roamed throughout most of the southeastern United States but is now found in just one struggling, tiny population in eastern North Carolina, recovery in additional areas is necessary to conserve the wolf. An updated

13

recovery plan would evaluate other areas where the red wolf once lived for additional reintroductions of captive wolves to the wild.

57. As the Center's petition explains, conservation of the red wolf requires development of an updated red wolf plan that would include these key actions: (1) revising the regulatory framework to reduce removals of red wolves from the wild; (2) resuming coyote sterilization to diminish hybridization; (3) resuming the pup fostering program to increase the wild population's genetic diversity; (4) utilizing additional reintroduction sites to increase the size of the wild red wolf population and expand its range; and (5) using outreach and education to garner additional support for red wolves and reduce illegal killings.

58. Because the Service has not updated its recovery plan to evaluate additional areas within the wolf's historic range for reintroductions, prescribed any now-proven methods for addressing current threats facing red wolves, or otherwise utilized procedures that reflect the best available science on red wolf recovery and management, the Service has not adequately "utilize[d its] authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed," in violation of ESA section 7(a)(1), 16 U.S.C. § 1536(a)(1). The Service has likewise failed to fulfill the ESA's directive in section 2(c)(1) that "that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." *Id*. § 1531(c)(1).

59. The Service's violation of the ESA's sections 7(a)(1) and 2(c)(1)'s affirmative duty to conserve violates the ESA and is otherwise arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

# THIRD CLAIM FOR RELIEF

**APA: Unlawfully withholding and delaying revision of the outdated red wolf recovery plan**

60. The Center hereby realleges and incorporates all preceding paragraphs.

61. The Service has not revised the red wolf recovery plan since its drafting in 1990, even though the agency recognized the "high priority" need to do so and despite the Service's declaration, in response to the Center's petition, that it intended to update the plan last year. The Service's inaction reverses, without explanation, the agency's prior position on the need to update the plan.

62. The imminent threat of extinction to the wild red wolf population – found only in eastern North Carolina with just 14 known animals remaining – shows that the agency's delay is unreasonable.

63. The Service's failure to update the red wolf recovery plan is "agency action unlawfully withheld or unreasonably delayed" in violation of the APA. 5 U.S.C. § 706(1). In addition, the failure to update the red wolf recovery plan in response to (and while purportedly agreeing with) the Center's petition violates section 552(b) of the APA, which provides, in pertinent part, that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." *Id*. § 555(b).

# PRAYER FOR RELIEF

The Center respectfully requests that the Court grant the following relief:

A. Declare and adjudge that the Service violated section 4(f) of the ESA, 16 U.S.C. § 1533(f), by failing to develop and implement a recovery plan that provides for the "conservation and survival" of the red wolf;

B. Declare and adjudge that the Service, by refusing to revise the outdated red wolf recovery plan, has failed to satisfy the ESA's section 7(a)(1) and section 2(c)(1) affirmative duty to conserve the red wolf, 16 U.S.C. §§ 1531(c)(1), 1536(a)(1), and is in violation of the APA, 5 U.S.C. § 706(2)(A);

C. Declare and adjudge that the Service violated the APA, 5 U.S.C. §§ 551-559, 701-706, by withholding or delaying an updated red wolf recovery plan;

D. Order the Service to prepare an updated recovery plan for the red wolf that reflects recent science, prescribes methods necessary for wolf conservation, and evaluates additional areas to pursue red wolf recovery according to a timetable established by the Court;

E. Award the Center its reasonable fees, costs and expenses associated with this litigation under 16 U.S.C. § 1540(g)(4) and 28 U.S.C. § 2412; and

F. Grant such further and other relief as the Court deems just and proper to remedy the Service's violations of law.

DATED: November 19, 2019

Respectfully submitted,

*/s/ Collette L. Adkins*
Collette L. Adkins (MN Bar No. 035059X)
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN 55014-0595
(651) 955-3821
cadkins@biologicaldiversity.org

*/s/ Perrin W. de Jong*
Perrin W. de Jong (NC Bar No. 42773)
Center for Biological Diversity
P.O. Box 6414
Asheville, NC 28816
(828) 774-5638
perrin@biologicaldiversity.org

*Attorneys for Plaintiff*